# In the United States Court of Federal Claims

BID PROTEST

No. 19-839C

(Filed Under Seal: September 6, 2019 | Reissued: September 24, 2019)*

|  |  |  |
|---|---|---|
| | ) | Keywords: Material Misrepresentation; |
| NETCENTRICS CORPORATION, | ) | Key Personnel; Final Proposal Revisions; |
| | ) | Corrective Action; Award Rescission. |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

*Karen R. Harbaugh* and *Jeremy W. Dutra*, Squire Patton Boggs (US) LLP, Washington, DC, for Plaintiff.

*Antonia R. Soares*, Trial Attorney, Commercial Litigation Branch, U.S. Department of Justice, Washington, DC, for Defendant, with whom were *Douglas K. Mickle*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, and *Joseph H. Hunt*, Assistant Attorney General. *Lisa Marie Golden*, *Michael G. Anderson*, and *Aaron M. Levin*, Assistant General Counsel, Office of General Counsel, Washington Headquarters Services & Pentagon Force Protection Agency, Department of Defense, Washington, DC, Of Counsel.

---

* This opinion was originally issued under seal and the parties were given the opportunity to request redactions. The government did not request any redactions. At NetCentrics's request, the Court has redacted the name of the individual NetCentrics proposed for Deputy Program Manager, as well as that person's position title under the previous NetCentrics incumbent contract. The Court has substituted "Mr. A" for the individual's name. The Court also redacted certain specified information that factored into the Source Selection Authority's trade-off analysis.

The Court rejected, however, NetCentrics's proposed redaction of the substance of the email Mr. A sent to government personnel on November 2, 2018. The email is not confidential nor proprietary, does not implicate Mr. A's privacy interest, and provides helpful background information about a key issue in the case.

## OPINION AND ORDER

**KAPLAN, Judge.**

Plaintiff NetCentrics Corporation ("NetCentrics") protests the decision of the Department of Defense Washington Headquarters Services ("WHS" or "the agency") to rescind a contract award it made to NetCentrics and disqualify it from the competition. WHS took this corrective action after one of NetCentrics's competitors filed a bid protest with the Government Accountability Office ("GAO"). During the course of investigating the validity of that protest, the agency determined that NetCentrics's final proposal revision ("FPR") included material misrepresentations regarding the employment status and availability of its proposed Deputy Program Manager ("DPM").

NetCentrics argues that any inaccuracy in its proposal was immaterial and that the agency's decision to disqualify it from the procurement and rescind its contract award was arbitrary, capricious, and contrary to law. For the reasons discussed below, the Court disagrees. The agency reasonably concluded that NetCentrics's FPR contained material misrepresentations and it acted within its discretion when it took corrective action on that basis. Therefore, NetCentrics's motion for judgment on the administrative record ("MJAR") is **DENIED** and the government's cross-motion for judgment on the administrative record is **GRANTED**.

## BACKGROUND

### I.    The Solicitation

The agency issued Solicitation No. HQ003418R0044 ("the Solicitation") on March 22, 2018. Admin. R. ("AR") Tab 1 at 1. It subsequently amended the Solicitation eight times. See generally AR Tabs 2–9. Of these amendments, five occurred before initial proposals were due on August 10, 2018. See generally AR Tabs 6–7 (Amendment 0005 dated August 2, 2018 and Amendment 0006 dated August 27, 2018); see AR Tab 6 at 1103–04 (proposals due by August 10, 2018 at 2:00 pm EST).

The Solicitation requested quotes on a contract to provide "Information Technology (IT) Support Services – Service Delivery" for the Department of Defense's Joint Service Provider ("JSP"). AR Tab 6b at 1243 (revised performance work statement ("PWS") dated August 1, 2018). The JSP "is dedicated to helping supported user organizations achieve mission success by providing secure, robust, reliable, and state-of-the-art enterprise IT solutions" to the WHS in the National Capital Region, including the Pentagon. Id.[1] The successful offeror would "provide all personnel, equipment, supplies, facilities, transportation, tools, materials, supervision, and other

---

[1] The JSP "was established in 2015 to consolidate the delivery of information technology (IT) services to more than 38,000 customers in the Pentagon and National Capital Region." Def. Information Sys. Agency, "Joint Service Provider," https://storefront.disa.mil/kinetic/disa/service-catalog#/forms/joint-service-provider (last updated Feb. 21, 2019).

items and non-personal services necessary to perform" the work set forth in the Solicitation's PWS. Id.

The Solicitation contemplated award of "a hybrid Firm Fixed Price, Time and Materials and Labor Hours contract." AR Tab 6a at 1229. Proposals would be evaluated on the basis of three factors: Technical Approach & Capability; Past Performance; and Price. AR Tab 6a at 1195. The Solicitation instructed offerors to "[a]ssume that the Government has no prior knowledge of the Offeror's capabilities and experience, and [that the agency would] base its evaluation only on the information presented in the Offeror's proposal." Id. at 1190.

As part of the Technical Approach & Capability factor, the agency was to evaluate the personnel matrix and key personnel resumes submitted with each proposal. Id. at 1198. The positions of Lead Program Manager and Deputy Program Manager were specified as "essential to the work" to be performed under the contract—i.e., "Key Personnel." AR Tab 6b at 1260–61. Offerors were required to submit resumes for proposed key personnel, "specify[ing] which PWS tasks the individual [would] perform, and . . . the individual's proposed duties and responsibilities." AR Tab 6a at 1194. The Solicitation stated that commitment letters from key personnel were "desired" but it did not require their submission. Id.; AR Tab 6 at 1106.  The Solicitation also cautioned that "an offer can be rejected if it does not have a firm commitment from the persons that are listed in the proposal." AR Tab 6b at 1263.

## II.    NetCentrics's Proposal and Final Proposal Revision

Four offerors, including NetCentrics, submitted proposals on August 10, 2018. AR Tab 25 at 2960. The agency found three of those four proposals eligible for consideration, including the one submitted by NetCentrics. Id. at 2960, 2962, 2970.

NetCentrics listed Mr. A as its proposed DPM. See, e.g., AR Tab 10 at 1809. As of August 10, Mr. A was the [* * *] on NetCentrics's existing JSP service delivery contract, and had been since July of 2017. Id. at 1810. The proposal also characterized Mr. A's availability to perform on the new contract as "[i]mmediate." Id. at 1809.

In its proposal, NetCentrics highlighted that it was "the only offeror who [could] promise JSP: we already employ every member of our JSP Service Delivery team, and they all have CACs, clearances, and JSP accounts to perform on Day 1 of the new contract." Id. at 1803. It emphasized that its key personnel "exceed position requirements in every category" and that their "1-year commitment to JSP enhances program stability because of reduced leadership turnover." Id. at 1805.

Mr. A left his employment at NetCentrics, effective November 3, 2018, while NetCentrics's initial proposal was pending. AR Tab 32c at 3244. NetCentrics later explained to the agency that Mr. A left because—due to "family obligations"—he wanted more employment security than NetCentrics could provide. AR Tab 32e at 3253. He had already been working under several short-term bridge contracts and the prospect of a long-term contract was uncertain. Id. The new opportunity, on the other hand, provided greater certainty. Id.

In a November 2, 2018 email to members of the JSP team, Mr. A thanked them for their support during his tenure and observed that the decision to leave "was not an easy one to make,"

3

but that it was one "that takes my career to its next phase and [I] am prepared to give it my best shot." AR Tab 32f at 3256. Before his departure, Mr. A allegedly expressed to NetCentrics's JSP Program Director his "interest and willingness" to return to NetCentrics in the future should the opportunity present itself, including if NetCentrics received the contract award under the RFP. AR Tab 32e at 3253.

On November 27, 2018, NetCentrics informed the contracting officer ("CO") and JSP customer and contracting officer representative responsible for its bridge contract of Mr. A's departure. AR Tab 41 at 3442. It did not, however, tell the CO or contract specialist responsible for the pending competition under the Solicitation that—contrary to the representations in Mr. A's resume, which it submitted with its initial offer—Mr. A was no longer a current employee of NetCentrics. AR Tab 32 at 3218.[2]

The agency engaged in discussions with the three eligible offerors beginning on November 20, 2018. AR Tab 25 at 2962. None of the discussion questions posed to NetCentrics concerned its key personnel. See AR Tabs 13–14 at 2294–305; see also AR Tab 32 at 3206. FPRs were due on December 3, 2018 at 5:00 pm. AR Tab 25 at 2962. All three remaining offerors, including NetCentrics, submitted their FPRs on that date. Id.

Notwithstanding that Mr. A had left the company thirty days before, NetCentrics continued to propose him as the DPM in its FPR. AR Tab 19 at 2412–13, 2430, 2437–40. Mr. A was still identified as a "current employee" with "[i]mmediate" availability in the FPR, and NetCentrics did not revise the portion of its proposal stating that it "already employ[ed] every member of [its] JSP Service Delivery team." Id. at 2431, 2437. Its FPR also contained the promised one-year commitment for key personnel that had been set forth in the initial proposal. Id. at 2433.

## III.  Contract Award to NetCentrics

The TET finalized its evaluation of NetCentrics's technical proposal on January 11, 2019. AR Tab 22 at 2870–98. It assigned a rating of "Outstanding" to NetCentrics's proposal under the Technical Approach & Capability factor. Id. at 2872. Among other things, the TET determined that the proposal presented a low performance risk because NetCentrics had "propos[ed] Key Personnel agreeing to a one-year commitment to provide program stability." Id.

NetCentrics received a strength for its "Key Personnel One-Year Commitment." Id. at 2892. The TET found that this feature of the proposal would provide "a substantial benefit to the Government since this will allow a continuity of capable and knowledgeable contractor Key Personnel that have historically demonstrated success in executing the JSP's requirements similar to this Service Delivery requirement." Id. The TET also found it significant that the proposed Key Personnel had "existing knowledge of the JSP organization and the JSP's current

---

[2] Certain members of the technical evaluation team ("TET") had personal knowledge of Mr. A's departure from NetCentrics, but they were instructed to "only consider information contained in the FPR, and to not evaluate any information known outside of the proposal itself." AR Tab 32 at 3218.

challenges." Id. The TET further observed that the promised one-year commitment of NetCentrics's key personnel would "provide stability to the JSP" and would "allow the Government to maintain a continuity of service and knowledge decreasing the risk of unsuccessful performance." Id.

The TET also assigned a strength based on NetCentrics's "Incumbent Personnel." Id. at 2889–90. It reasoned that NetCentrics "and their proposed team already operate and are familiar with the requirements [of the Solicitation], and this in turn can allow [NetCentrics] to focus on achieving a more efficient execution of services from the initial transition-in period." Id.

On January 29, 2019, the Source Selection Authority ("SSA") completed a best value determination. See generally AR Tab 25. Although offeror NCI, like NetCentrics, had received an "Outstanding" rating for the Technical Approach & Capability factor, the SSA found that NetCentrics had a "better technical approach." Id. at 2975. The SSA so concluded on the basis of NetCentrics's inclusion of [* * *] in its proposal and its lack of any assigned weaknesses. Id. NetCentrics's technical approach was also more highly rated than that of the third offeror, which earned a "Good" rating. Id.

As to the Past Performance factor, although all three offerors received a "Satisfactory Confidence" rating, the SSA determined that NetCentrics's "past performance experience and ability in the current JSP environment [would] allow [it] to quickly ramp-up its performance of IT services and reduce the risk of any lapse in services." Id. at 2975–76. These advantages of NetCentrics's proposal, along with the fact that it proposed the lowest price, led the SSA to conclude that NetCentrics's proposal represented "the best overall value" to the government. Id. at 2976. NetCentrics was awarded the contract on January 31, 2019. See generally AR Tab 29.

## IV.   NCI's GAO Protest and the Resulting Agency Investigation

After learning that it had not secured the contract award, NCI filed a bid protest at GAO on February 5, 2019. AR Tab 30 at 3162. In addition to challenging the reasonableness of the agency's evaluation of its proposal, NCI alleged—based on an update to Mr. A's LinkedIn profile—that Mr. A was not available to perform as DPM at the time of contract award. Id. at 3167–70. NCI argued that Mr. A's unavailability constituted grounds to sustain its protest whether or not NetCentrics had informed the agency of his departure. Id. at 3170–71.

NCI's bid protest prompted the CO, Juanita Jones, to send NetCentrics a letter on February 6, 2019 requesting verification of Mr. A's employment and availability. AR Tab 32b at 3241–42. Specifically, she asked whether Mr. A was still employed by NetCentrics and, if not, when his employment ended. Id. at 3241. She also asked whether NetCentrics could produce Mr. A for the DPM position consistent with the terms of its proposal and, if not, when NetCentrics became aware that Mr. A would be unable to perform in the position. Id.

On February 7, 2019, Steve Walker (SVP Strategic Programs at NetCentrics) responded to the CO's letter by email. AR Tab 32c at 3244. In response to Ms. Jones's first question, he stated that "Mr. A is no longer employed by NetCentrics" and that "[h]is last date of employment was November 3, 2018." Id. Mr. Walker asserted nonetheless that Mr. A would be available to perform as DPM, consistent with the terms of the proposal. Id. He explained that "NetCentrics's

managers have maintained contact with Mr. A since his departure from NetCentrics as a fulltime employee." Id. In addition, Mr. Walker stated, NetCentrics had informed Mr. A that it had been awarded the JSP IT service delivery contract and had "verified that Mr. A is available to return, and his interest in returning, as a fulltime employee of NetCentrics in the position of Deputy Program Manager for the JSP IT Service Delivery contract consistent with the terms of our proposal." Id.

In light of these responses, on February 7, 2019, Ms. Jones made further inquiries. AR Tab 32d at 3248–49. She observed that Mr. Walker's email "lacked any documentation showing that Mr. A, either after leaving employment with NetCentrics on 3 November 2018 and before NetCentrics'[s] 3 December 2018 FPR, or after NetCentrics received Notice of Award on 31 January 2019, was committed to be the Deputy Program Manager." Id. at 3248. She therefore requested the following information from NetCentrics:

1.  Certification from NetCentrics that the 3 December 2018 FPR was true and accurate at the time of submission regarding the availability and commitment of Mr. A to perform as Deputy Program Manager upon award.

2.  An affidavit that describes:

    a.  All commitments made by Mr. A to NetCentrics demonstrating an intent to perform on Contract No. HQ0034-19-F-0093, including, but not limited to, before NetCentrics's FPR was submitted on 3 December 2018 and subsequent to award. Please include specific dates.

    b.  Any rationale or information that NetCentrics had regarding its understanding and belief that Mr. A, after leaving his employment with NetCentrics on 3 November 2018 (one month before NetCentrics's FPR was submitted on 3 December 2018), would leave his current employment to return to NetCentrics upon award of Contract No. HQ0034-19-F-0093.

    c.  When NetCentrics first contacted Mr. A regarding the 31 January 2019 award of the instant contract and his employment on the contract.

Id. at 3248–49.

NetCentrics responded to the agency's February 7 inquiries in a February 11 letter from Natalie Catliota, NetCentrics's Chief Operating Officer ("COO"). AR Tab 32e at 3251. Ms. Catliota stated that when it prepared its FPR, NetCentrics focused on the issues raised in discussions and "did not perform a subsequent review of sections not impacted by the Evaluation Notice." Id. "As a consequence," Ms. Catliota noted, "NetCentrics did not review or update Mr. A['s] resume to reflect that he was not, at the time, employed by NetCentrics." Id. Ms. Catliota stated, however, that it was NetCentrics's understanding that the agency was aware of Mr. A's departure because—as noted above—a different NetCentrics employee had been identified for the DPM position in NetCentrics's November 27, 2018 proposal seeking renewal of its bridge contract. Id.; AR Tab 41 at 3442; see also AR Tab 32f at 3255 (October 30, 2018 email from Mr.

Ikonomidis to several agency personnel identifying different employee to replace Mr. A as DPM on bridge contract).

Ms. Catliota continued by affirming that "[n]otwithstanding the change in Mr. A['s] employment status, NetCentrics certifies that the 3 December 2018 FPR was true and accurate at the time of submission as to the availability and commitment of Mr. A to perform as [DPM] upon award." AR Tab 32e at 3251. According to Ms. Catliota, it was "NetCentrics's intent," at the time of FPR submission and as of the date of the letter, "to rehire Mr. A in the [DPM] position upon award and commit him in that position for a minimum of one year." Id.

Enclosed with the letter was a declaration by Mr. Walker. Id. at 3252–53. He stated that Mr. A had participated in preparing the initial proposal, and that he was aware that he had been proposed as DPM with immediate availability. Id. at 3252. Mr. Walker added that, based on his conversations with "corporate personnel," he understood that Mr. A had never, either before or after his departure, "inform[ed] NetCentrics that he would not be available immediately to perform the [DPM] position should NetCentrics receive the contract award." Id.

Mr. Walker's declaration also recounted positive comments that Mr. A had made to other members of NetCentrics's management team before his departure. See id. at 3252–53 (stating that before November 3, Mr. A expressed that he "enjoyed working at NetCentrics," that he "looked forward to working with [the company] in the future," and that he "felt terrible" leaving). Mr. Walker also stated that Mr. A "expressed" to Mr. Johnson, NetCentrics's JSP Program Director, "his interest and willingness to return to NetCentrics in the future should the opportunity present, including if NetCentrics received the contract award under the RFP." Id. at 3253. Mr. Walker further stated that Mr. A had participated in two telephone calls and one in-person meeting with Vasili Ikonomidis (NetCentrics's JSP Service Delivery Program Manager) "[b]etween 4 December 2018 and 31 January 2019," during which Mr. A inquired about the possibility of NetCentrics receiving the award. Id. Finally, Mr. Walker represented that on February 6, 2019, Mr. Ikonomidis "had a detailed discussion with Mr. A to confirm that he remained interested in returning to NetCentrics employment in the [DPM] position." Id.

## V.     Disqualification of NetCentrics and Rescission of Award

After reviewing NetCentrics's submissions, Ms. Jones determined that NetCentrics's FPR contained a "material misrepresentation of its Key Personnel, namely Mr. A as its Deputy Program Manager." AR Tab 32 at 3218. Ms. Jones observed that Ms. Catliota's letter had included a discussion of NetCentrics's intent to rehire Mr. A, but did not discuss any commitment on Mr. A's part to return. Id. at 3213. In particular, Ms. Jones stated, Ms. Catliota had not specifically confirmed—as of the date the FPR was submitted (December 3, 2018)—Mr. A's availability and commitment to return in the event that NetCentrics was the successful offeror. Id.

Ms. Jones concluded that it was not significant that Mr. A was aware that he had been identified as one of the key personnel in the initial proposal. Id. at 3213–14. That awareness was "immaterial to whether he had knowledge that he was subsequently proposed in the FPR." Id. She also observed that Mr. A's awareness of his inclusion in the initial (but not final) proposal was not relevant to his "intent to perform on the contract after leaving NetCentrics on 3

November 2018." Id. at 3214. Ms. Jones further concluded that the positive remarks that Mr. A allegedly made about NetCentrics before his departure (such as how "he looked forward to working with . . . NetCentrics in the future") were typical of the kind of comments that are expressed at an exit interview "to remain collegial with a former employer." Id. at 3215. She also opined that Mr. Walker's declaration discussed Mr. A's intentions in a "superficial fashion" and demonstrated "no firm commitment or first-hand knowledge of Mr. A'[s] commitment to NetCentrics." Id.

Furthermore, Ms. Jones characterized Mr. Walker's declaration as "attempt[ing] to obfuscate" in connection with the statement that "Mr. A[] did not 'inform NetCentrics that he would not be available immediately to perform.'" Id. at 3214 (quoting AR Tab 32e at 3252). She emphasized that it was NetCentrics's sole "responsibility" to "ensure that its proposal is true and accurate at the time it was submitted." Id. She found that NetCentrics had not fulfilled its obligation to alert the WHS Acquisition Directorate to Mr. A's change in employment during the thirty-day period between his departure and submission of the FPR. Id. at 3217–18.

Ms. Jones also found it significant that—notwithstanding that she had asked NetCentrics to supply the specific dates of any commitments Mr. A made—Mr. Walker's declaration did not do so. Id. at 3216. Instead, his declaration referred to date ranges—i.e., "'before 3 November 2018' [and] '[b]etween 4 December 2018 and 31 January 2019.'" Id. (citing AR Tab 32e at 3252–53).

In short, Ms. Jones explained, the government "asked NetCentrics to show that Mr. A was properly proposed as the key personnel of Deputy Program Manager and that Mr. A[] had the intent to perform as of December 3, 2018, the time NetCentrics submitted its FPR." Id. at 3219. Instead, Ms. Jones observed, "[t]he information provided by NetCentrics focused on whether Mr. A is currently available and willing to perform on the awarded contract"—i.e., on Mr. A's commitment as of February 2019. Id. Based on NetCentrics's admission that Mr. A had left its employment and its failure to supply information responsive to the government's concerns, Ms. Jones determined that NetCentrics's FPR contained a material misrepresentation. Id. at 3218. She therefore decided on February 26, 2019 to rescind the contract award, reopen the procurement, and disqualify NetCentrics from the competition. Id. at 3218–19.

The agency notified NetCentrics of its decision in a February 26 letter signed by CO Tommie L. McCloud. AR Tab 33 at 3257–60.[3] After recounting relevant events and correspondence, the letter stated that Mr. A was not "[i]n fact," an employee of NetCentrics on December 3 and that NetCentrics had twice "failed to demonstrate" that Mr. A had ever "made a firm commitment to NetCentrics to be proposed as the [DPM] after his departure from the company and that there was a reasonable expectation that Mr. A would be available to perform . . . immediately upon award or through the proposed one-year commitment." Id. at 3258. The

---

[3] While Ms. Jones was listed as "Contracting Officer" in both the discussion letters and the inquiries immediately after NCI's protest in early February, she is listed on her determination memorandum as "Branch Chief." AR Tab 32 at 3219. Mr. McCloud is listed as "Contracting Officer" on the February 26 letter notifying NetCentrics of its disqualification and award rescission. AR Tab 33 at 3260.

letter then cited a list of factors the agency considered. Among these was the fact that NetCentrics's February correspondence "did not contain any evidence of any communications between any member of NetCentrics and Mr. A between 3 November 2018 and 3 December 2018 establishing a commitment by Mr. A to continue to propose Mr. A as [DPM]." Id. at 3259. Mr. McCloud also observed that Mr. Walker's declaration "did not contain any direct or explicit commitments made by Mr. A to NetCentrics demonstrating an intent to perform on [the new contract] before NetCentrics's[s] FPR was submitted on 3 December 2018 and subsequent to award on 31 January 2019." Id.

In conclusion, Mr. McCloud informed NetCentrics that the agency had determined that its FPR contained a material misrepresentation "stating that Mr. A is a 'Current Employee' and available 'Immediately' to perform on the contract resulting from the instant solicitation." Id. at 3260. Because the agency relied on the misrepresentation in evaluating proposals, Mr. McCloud wrote, it "resulted in an improper award that warrant[ed]" the rescission of the award and NetCentrics's disqualification from the procurement. Id.

On the same day, the agency sent a notice of corrective action to GAO. AR Tab 35 at 3263. It reported that the agency would "issue a new best value determination," and that NCI's protest was therefore moot. Id. The agency requested that GAO dismiss the protest. Id. GAO obliged and dismissed NCI's protest on March 5, 2019. AR Tab 36 at 3264.

## VI.    NetCentrics's GAO Protest

Between its disqualification on February 26 and GAO's dismissal of NCI's protest on March 5, NetCentrics filed its own GAO protest on March 1, 2019. AR Tab 41 at 3427. NetCentrics argued that: (1) the agency's determination that the FPR contained a material misrepresentation was "factually and legally erroneous"; (2) the agency applied unstated evaluation criteria by requiring NetCentrics to show that its proposed DPM was "a current employee" or that it had a commitment letter to demonstrate the employee's availability; and (3) the agency treated NetCentrics unequally by requiring evidence of key personnel commitment "beyond what the Solicitation required." Id. at 3427–28. Among other exhibits to its protest, NetCentrics included a letter signed by Mr. A and dated March 1, stating that he was committed to performing as DPM, contingent upon award to NetCentrics. Id. at 3729. The letter also affirmed that Mr. A was available to begin performance "on the effective date of the contract." Id.

On April 1, 2019, GAO requested that NetCentrics provide a "sworn affidavit from Mr. A that when he left NetCentrics to take a position at a different company he intended that move to be temporary and intended to return to NetCentrics." AR Tab 47 at 3816. GAO further requested supporting documentation to the effect that Mr. A's new position was temporary. Id.

In response to GAO's request, NetCentrics provided a declaration from Ms. Catliota, not Mr. A. AR Tab 48 at 3832. Ms. Catliota stated that she had spoken with Mr. A by telephone on April 9, 2019 and that he had "expressed to [her] his disbelief about [the agency's] determination." Id. Ms. Catliota also reported that Mr. A confirmed that when he left NetCentrics in November, "he understood that [it] would continue to propose him for the [DPM] position." Id. Finally, Ms. Catliota informed GAO: "While Mr. A is, and remains, supportive of

NetCentrics, as a third party, he is reticent to be involved with the protest and specifically declined to provide the information GAO requested." Id.

GAO denied the protest on June 5, 2019. AR Tab 50 at 3844. It found the agency's corrective action reasonable because, in its view, "while the record shows that Mr. [A] left open the possibility of returning to NetCentrics, there is no evidence that he was immediately available, as the resume submitted to the agency stated." Id. at 3848–49. In response to NetCentrics's contention that no letter of commitment was required, GAO reasoned that "the solicitation did indicate letters of intent were desired . . . [and] the solicitation advised vendors that failure to have a firm commitment from key personnel could result in rejection." Id. at 3849. Thus, GAO opined, the Solicitation "indicated that, at a minimum, the agency would consider the commitment of key personnel." Id. Further, GAO found that the record showed that the "agency's evaluation considered the current employment of key personnel." Id.

For those reasons, GAO found that NetCentrics's failure to alert the procurement team that Mr. A was no longer a current employee when it submitted its FPR "deprived the agency of the opportunity to properly evaluate the [proposal]." Id. On this basis, GAO concluded that the agency "reasonably" considered the proposal's discrepancies to be a material misrepresentation and "acted reasonably" in rescinding the award and disqualifying NetCentrics. Id.

## VII.    This Action

The day after GAO denied its protest, NetCentrics filed its complaint in this court. ECF No. 1. NetCentrics also moved for a preliminary injunction. ECF No. 4.[4] The government filed the administrative record on June 19, 2019. ECF No. 22. NetCentrics filed its MJAR on July 8, and the government's cross-motion followed on July 23. ECF Nos. 27, 35. The cross-motions have been fully briefed. ECF Nos. 38, 40. Oral argument was held on August 27, 2019.

## DISCUSSION

## I.    Subject-Matter Jurisdiction

The Court of Federal Claims has jurisdiction over bid protests in accordance with the Tucker Act, 28 U.S.C. § 1491, as amended by the Administrative Dispute Resolution Act of 1996 § 12, 28 U.S.C. § 1491(b). Specifically, the Court has the authority "to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1); see also Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1380–81 (Fed. Cir. 2012) (observing that § 1491(b)(1) "grants jurisdiction over objections to a solicitation, objections to a proposed award, objections to an award, and

---

[4] The Court has merged consideration of the preliminary injunction motion with its consideration of the cross-motions for judgment on the administrative record. See Scheduling Order, ECF No. 15.

objections related to a statutory or regulatory violation so long as these objections are in connection with a procurement or proposed procurement").

To possess standing to bring a bid protest, a plaintiff must be an "interested party"—i.e., an actual or prospective bidder (or offeror) who possesses a direct economic interest in the procurement. Sys. Application & Techs., Inc., 691 F.3d at 1382 (citing Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1359 (Fed. Cir. 2009)); see also Orion Tech., Inc. v. United States, 704 F.3d 1344, 1348 (Fed. Cir. 2013). An offeror has a direct economic interest if it suffered a competitive injury or prejudice as a result of an alleged error in the procurement process. Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1370 (Fed. Cir. 2002) (holding that "prejudice (or injury) is a necessary element of standing"); see also Weeks Marine, Inc., 575 F.3d at 1360.

It is evident that NetCentrics has standing to pursue the present bid protest. Taking its allegations of error to be true, NetCentrics would have retained its contract award but for the agency's erroneous rescission of that award and disqualification of NetCentrics. Because the alleged error directly stripped NetCentrics of the award, NetCentrics clearly has standing and the Court has subject-matter jurisdiction over its protest.

## II.      Motions for Judgment on the Administrative Record

Parties may move for judgment on the administrative record pursuant to Rule 52.1 of the Rules of the Court of Federal Claims ("RCFC"). Under RCFC 52.1, the Court reviews an agency's procurement decision based on the administrative record. See Bannum, Inc. v. United States, 404 F.3d 1346, 1353–54 (Fed. Cir. 2005). The Court makes "factual findings under RCFC [52.1] from the record evidence as if it were conducting a trial on the record." Id. at 1357. Thus, "resolution of a motion respecting the administrative record is akin to an expedited trial on the paper record, and the Court must make fact findings where necessary." Baird v. United States, 77 Fed. Cl. 114, 116 (2007). The Court's inquiry is "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." A&D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006). Unlike a summary judgment proceeding, genuine issues of material fact will not foreclose judgment on the administrative record. Bannum, Inc., 404 F.3d at 1356.

## III.      Scope of Review of Procurement Decisions

The Court reviews challenges to procurement decisions under the same standards used to evaluate agency actions under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. See 28 U.S.C. § 1491(b)(4) (stating that "[i]n any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5"). Thus, to successfully challenge an agency's procurement decision, a plaintiff must show that the agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see also Bannum, Inc., 404 F.3d at 1351.

An agency's procurement decision, including a decision to take a corrective action, is reviewed under the APA's "'highly deferential' 'rational basis' standard." Dell Fed. Sys., L.P. v. United States, 906 F.3d 982, 992 (Fed. Cir. 2018) (quoting Croman Corp. v. United States, 724

F.3d 1357, 1363 (Fed. Cir. 2013)). "The rational basis test asks 'whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" Id. (quoting Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1351 (Fed. Cir. 2004)). Under the rational basis standard, reviewing courts are required to "sustain an agency action evincing rational reasoning and consideration of relevant factors." Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974)); see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (noting that under the APA a court should review agency action to determine if the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action"); Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332–33 (Fed. Cir. 2001) (noting that court's function in bid protest is limited to "determin[ing] whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion'") (quoting Latecoere Int'l, Inc. v. U.S. Dep't of Navy, 19 F.3d 1342, 1356 (11th Cir. 1994)).

Therefore, when viewing an agency procurement decision, the Court cannot substitute its judgment for that of the agency. See Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (holding that as long as there is "a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion") (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971)). Further, the protester "bears a heavy burden" in attempting to show that a procuring agency's decision lacked a rational basis. Impresa, 238 F.3d at 1338. For the agency to prevail, it need only articulate "a rational connection between the facts found and the choice made," and courts will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43 (quotations omitted).

**IV.   Merits**

**A.   Elements of a Material Misrepresentation**

It is well established that to protect the integrity of the procurement process, an agency may disqualify a proposal that contains a material misrepresentation. See,e.g., Planning Research Corp. v. United States, 971 F.2d 736, 741 (Fed. Cir. 1992) (citing Informatics, Inc., 57 Comp. Gen. 217 (1978)). There are two components to a material misrepresentation in the procurement context: (1) a false statement; and (2) agency reliance on the false statement to favorably evaluate the proposal. See Bannum, Inc. v. United States, 119 Fed. Cl. 291, 307 (2014); GTA Containers, Inc. v. United States, 103 Fed. Cl. 471, 483 (2012); Blue & Gold Fleet, LP v. United States, 70 Fed. Cl. 487, 495 (2006).

NetCentrics argues that in order to disqualify its proposal on material misrepresentation grounds, the agency was required to find not only that it made false statements upon which the agency relied, but also that it did so with the intent to deceive the agency. It observes that several judges on this court have stated that intent to make a false statement is a necessary element of a material misrepresentation. See, e.g., Alaska Structures, Inc. v. United States, 144 Fed. Cl. 80, 84 (2019) (observing that to establish material misrepresentation, the offeror "must [] intend the incorrect statement" and collecting cases); Northrop Grumman Corp. v. United States, 50 Fed. Cl. 443, 468 (2001) (offeror must "intend to make the misstatement"). But see GTA Containers,

103 Fed. Cl. at 483 n.8 (rejecting <u>Northrop Grumman</u> standard, observing that the "grafting of additional requirements onto the standard for a material misrepresentation is not supported by binding precedent").

The Court agrees that a material misstatement made with the intent to deceive reflects particularly egregious behavior that directly threatens the integrity of the procurement process. But that does not mean that an agency lacks the discretion to disqualify a proposal that contains a material misrepresentation that an offeror included inadvertently (as opposed to intentionally) in its proposal.

Thus, an offeror has an obligation to submit a proposal that is, to the greatest extent possible, an accurate one. An offeror that inadvertently includes a material misrepresentation in its proposal concerning the availability of its proposed key personnel shirks this obligation and also undermines the agency's ability to make well-reasoned procurement decisions that serve the public interest. Therefore, an agency may reasonably reject such a proposal. <u>See</u> Aerospace Design & Fabrication, Inc., B-278896, 98-1 CPD ¶ 139 (Comp. Gen. May 4, 1998) ("[A]n offeror's misrepresentation concerning personnel that materially influences an agency's consideration of its proposal generally provides a basis for proposal rejection or reevaluation of the award decision based on the faulty proposal.") (citing ManTech Advanced Sys. Int'l, Inc., B-255719, 94-1 CPD ¶ 326 (Comp. Gen. May 11, 1994); CBIS Fed. Inc., 71 Comp. Gen. 319 (1992); Ultra Tech. Corp., B-230309.6, 89-1 CPD ¶ 42 (Comp. Gen. Jan. 18, 1989); Informatics, Inc., 57 Comp. Gen. 217 (1978)).[5]

Further, requiring a heightened showing of intent to deceive as a condition of rejecting proposals that contain material misrepresentations may reduce offerors' incentives to exercise due diligence when preparing their proposals, including in their identification of key personnel. <u>See</u> <u>Conley & Assocs., Inc. v. United States</u>, 142 Fed. Cl. 177, 182 (2019) (observing that using an "actual knowledge" standard in a "bait and switch" case would, among other things, "distort incentives for offerors to submit accurate proposals"); <u>see also</u> <u>Consol. Eng'g Servs., Inc. v. United States</u>, 64 Fed. Cl. 617, 632–33 (2005) (holding "bait and switch" may be found even absent knowledge of key personnel's unavailability, where it was "foreseeable that the individuals named in the proposal would not be available to perform the contract work") (quoting <u>OAO Corp. v. United States</u>, 49 Fed. Cl. 478, 481 (2001)); Am. Sys. Corp., B-417387, 2019 CPD ¶ 238 (Comp. Gen. June 11, 2019) (noting that to successfully mount a protest based on a bait and switch, the protestor must show that "the awardee either knowingly or negligently represented that it would rely on specific personnel that it did not have a reasonable basis to expect to furnish during contract performance").

For these reasons, the Court concludes that an agency may reasonably disqualify a proposal on material misrepresentation grounds where—despite the fact that the

---

[5] Although GAO opinions are not binding on the Court of Federal Claims, the Court "may draw on GAO's opinions for its application of [its] expertise." <u>See</u> <u>Allied Tech. Grp., Inc. v. United States</u>, 649 F.3d 1320, 1331 n.1 (Fed. Cir. 2011); <u>see also</u> <u>Univ. Research Co., LLC v. United States</u>, 65 Fed. Cl. 500, 503 (2005) (noting that GAO decisions are not binding on the court but "are persuasive").

misrepresentation was inadvertently included in the proposal—the agency relied upon it when making its award decision. The Court turns, therefore, to whether the CO's conclusions (1) that NetCentrics's proposal contained such misrepresentations, and (2) that the misrepresentations were material ones, reflect rational decision-making.

### B.      The Agency's Decision To Disqualify NetCentrics from the Competition

The agency concluded that NetCentrics's final offer contained several related misrepresentations: (1) that Mr. A was a current employee at the time NetCentrics submitted its FPR (December 3, 2018); (2) that he was immediately available for performance on the contract as of that time; and (3) that NetCentrics would make him available to work on the contract for at least one year. It found these misrepresentations material because the agency had relied upon them in awarding the contract to NetCentrics.

For the reasons set forth below, the Court concludes that the agency provided "a coherent and reasonable explanation of its exercise of discretion" to take corrective action rescinding the award to NetCentrics and disqualifying it from the competition. See Dell Fed., 906 F.3d at 992. It therefore rejects NetCentrics's protest and sustains the agency's decision.

### 1.      The Agency's Finding That NetCentrics's Final Proposal Contained Misrepresentations

The agency concluded that NetCentrics's final proposal contained several interrelated false statements. First, it found that Mr. A was no longer a "current employee" on December 3, 2018, when NetCentrics submitted its FPR. See AR Tab 33 at 3260. This finding is undisputed. As noted, Mr. A had left NetCentrics for new, more secure employment a month earlier, on November 3. Nonetheless, NetCentrics's final proposal included an outdated resume that listed Mr. A as a current employee and identified the dates of his employment as July 2017 through the "Present." AR Tab 19 at 2437–38.

NetCentrics argues that it cannot be faulted for failing to update Mr. A's resume because it understood that it could only make changes in its final proposal that were relevant to the matters raised in discussions. Pl.'s Mot. for J. on the Admin. R. ("Pl.'s MJAR") at 8, ECF No. 27. This contention is unsupported by the record. Ms. Catliota's letter indicates that NetCentrics did not update its proposal to reflect Mr. A's departure because it had been "focused" on the matters raised in discussions and did not perform a review of the other sections in the proposal. AR Tab 32e at 3251. Second, offerors have an "obligation to ascertain the continuing availability of key personnel" before submitting FPRs. OAO Corp., 49 Fed. Cl. at 482. Nothing prevented NetCentrics from notifying the agency of the change, even if it was not directly pertinent to the matters raised in discussions. Indeed, at oral argument in this case, counsel for NetCentrics conceded that its failure to update Mr. A's resume was, in hindsight, a mistake. Aug. 27, 2019 Hr'g at 2:07:40–10:12.

The agency also found false (at the time of the offer) NetCentrics's statement that Mr. A was immediately available to serve as DPM on any new contract awarded. That finding was based on the inquiry the agency conducted, post award, after NCI filed its bid protest with GAO. The purpose of the agency's inquiry was to determine whether NetCentrics had a reasonable

basis for representing that Mr. A was immediately available to work on the contract, consistent with its proposal, given that Mr. A had left NetCentrics and taken a new job a month before. Cf. ManTech, 94-1 CPD ¶ 326 (finding that where offeror proposed "its own employees serving in the positions for which they were offered," there was no need for "firm commitments" and sufficient basis to state that employees were "immediately available").

As explained in some detail above, the CO requested additional information from NetCentrics to ascertain the extent to which Mr. A had committed to return and perform on the contract, should NetCentrics receive the award. Among other things, she requested that NetCentrics submit an affidavit describing "[a]ll commitments" Mr. A had made to it which "demonstrate[ed] an intent to perform on [the contract]," including before NetCentrics submitted its FPR on December 3, 2018. AR Tab 32d at 3248–49. She also asked that NetCentrics include the "specific dates" those commitments were made. Id. at 3249.

In response, NetCentrics supplied the CO with a letter from its COO (Ms. Catliota) and a declaration by NetCentrics's SVP, Steve Walker. The CO concluded, however, that the additional information NetCentrics supplied did not show that—as of December 3, 2018—Mr. A had made a firm commitment to return to NetCentrics to work on the new contract. She also was not persuaded that NetCentrics had shown any other basis (as of that date) to reasonably expect that Mr. A, having accepted a new job, would leave it and return to work at NetCentrics on a new contract.

The CO examined and addressed Ms. Catliota's letter and Mr. Walker's declaration in detail and on a paragraph-by-paragraph basis. She explained that she was not convinced by Ms. Catliota's purported "certification" that the December 3, 2018 proposal was "true and accurate at the time of its submission as to the availability and commitment of Mr. A to perform as Deputy Program Manager upon award" because it was not supported by the documentation submitted. AR Tab 32 at 3211, 3216. Although Ms. Catliota stated that it was NetCentrics's "intent" at the time (and thereafter) to rehire Mr. A and that it "under[stood]" that it would be able to make him immediately available, those statements do not reflect what Mr. A intended or understood. See id. at 3213. Nor was there any other proof supplied that he had made a commitment to return.

Instead, the CO noted, the declaration stated that on February 6, 2019, another NetCentrics manager (Mr. Ikonomidis) "had a detailed discussion with Mr. A to confirm that he remained interested in returning to NetCentrics employment in the Deputy Program Manager position." Id. at 3215. But that discussion occurred well after NetCentrics submitted its proposal on December 3, 2018. And while Mr. Walker alleges that the purpose of the conversation was to "confirm" Mr. A's continued "interest[]" in returning, Mr. Walker did not include the specifics of the discussion, nor does the declaration state what Mr. A said in response—or if, in fact, he confirmed anything.[6]

---

[6] In its briefs, NetCentrics supports the reasonableness of its belief that Mr. A would return to work on a new contract by citing Mr. A's commitment letter dated March 1, 2019 and Ms. Catliota's representations made in April 2019 that Mr. A understood he would continue to be listed as DPM in any final proposal. Pl.'s MJAR at 5. These documents, however, were not before the agency when it made its decision and therefore are not relevant to the Court's review

The CO was also not persuaded by the statements contained in Mr. Walker's declaration that described communications between Mr. A and other NetCentrics managers both before and after he left his employment there. The declaration contained Mr. Walker's account of positive comments about NetCentrics that Mr. A had made to other managers in anticipation of his departure, including a statement that Mr. A had "expressed to Mr. Johnson his interest and willingness to return to NetCentrics in the future should the opportunity present, including if NetCentrics received the contract award under the RFP." AR Tab 32e at 3253. The CO characterized the discussions of Mr. A in the declaration as "superficial" in nature. AR Tab 32 at 3215. She dismissed the positive sentiments he allegedly expressed to others about NetCentrics, including his expression of "interest and willingness to return to NetCentrics in the future," as lacking specificity and typical of those that might be expressed at an exit interview. Id.

Further, the CO observed that she had requested that NetCentrics provide the specific dates on which it contended Mr. A had committed to return to its employ to perform on the new contract. Id. at 3216. But Mr. Walker's declaration did not include exact dates; instead it identified date ranges—i.e., "before 3 November 2018" and "between 4 December 2018 and 31 January 2019." Id. (quoting AR Tab 32e at 3253). It was not unreasonable for the CO to find that NetCentrics's inability to identify a clear date on which a commitment was made (or even "intentions" expressed) suggested that the discussions themselves were vague and nonspecific.

NetCentrics argues that the CO did not give sufficient weight to evidence of communications between NetCentrics and Mr. A after December 3, 2018 and before January 31, 2019 (when the award was made). During those communications, which included a one-on-one meeting between Mr. Ikonomidis and Mr. A, the latter allegedly asked about the potential for NetCentrics to receive the award. AR Tab 32e at 3253. Further, on February 1, 2019, Mr. A texted several of NetCentrics's personnel to congratulate them on the award, and he told one of them that day "that he still had not started operation on the new opportunity for which he left NetCentrics." Id. NetCentrics contends that these communications support its position that NetCentrics and Mr. A already had an understanding and continued to understand that he would return to NetCentrics to work on the new contract. But the Court does not believe that these exchanges demonstrate anything about whether Mr. A had committed to return to NetCentrics before December 3, 2018, or even whether there was a plan as of February 1 that he would do so.

NetCentrics also criticizes the CO for requiring proof of a "firm commitment" to establish its reasonable expectation that Mr. A would be immediately available to work on the contract. Pl.'s MJAR at 12–14 (citing Orion Int'l Techs. v. United States, 66 Fed. Cl. 569, 571–73 (2005)). NetCentrics argues that an offeror may have reasonable grounds to designate an individual who has not expressed a firm commitment to perform on the contract as one of its key personnel. Id. at 12–15. The Court agrees with NetCentrics that an offeror may have reasonable grounds to believe it could make an individual immediately available to work on a contract even

_____

of whether the agency's decision was a reasonable one. See Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1380 (Fed. Cir. 2009) ("The purpose of limiting review to the record actually before the agency is to guard against courts using new evidence to 'convert the arbitrary and capricious standard into effectively de novo review.'") (quoting Murakami v. United States, 46 Fed. Cl. 731, 735 (2000), aff'd, 398 F.3d 1342 (Fed. Cir. 2005)).

if it did not have a "firm commitment" from that individual. In <u>Orion International Technologies</u>, for example, it was undisputed that the offeror had an oral agreement with the employee of one of its competitors that he would come work for the offeror if it received the contract award. 66 Fed. Cl. at 573. But the existence of reasonable grounds in any particular case is very fact specific. And on the facts of this case, it was not unreasonable for the agency to require more evidence than NetCentrics supplied to demonstrate that Mr. A was committed to return, given that he had just left NetCentrics's employ for a new job.

Finally, NetCentrics points out that the Solicitation did not require it to secure commitment letters from proposed key personnel. It contends that the agency therefore applied a "heightened standard" or unstated evaluation criteria when it rescinded the contract award because NetCentrics did not produce sufficient evidence of a firm commitment by Mr. A to return to perform on the contract. Pl.'s MJAR at 16–17.

To begin with, the Court observes that the Solicitation in fact did state that "an offer can be rejected if it does not have a firm commitment from the persons that are listed in the proposal." AR Tab 6b at 1263. But more to the point, the agency did not request evidence of Mr. A's commitment based on any requirement set forth in the Solicitation. Instead, the agency was attempting to verify that—given the changed circumstances arising out of Mr. A's departure—NetCentrics had a reasonable basis for continuing to represent that it could make him immediately available. This was a rational response to the protest that NCI had filed, raising questions about whether NetCentrics actually intended to use Mr. A as the DPM on the contract.

In short, the CO provided a detailed explanation of her reasoning. And based on the information before her, she rationally concluded that Mr. A had not committed—before NetCentrics submitted its final proposal—to return to NetCentrics as DPM in the event that it secured the contract award. And because Mr. A had departed without making any commitments, it was also rational for the CO to find that NetCentrics lacked a reasonable basis for expecting (as opposed to hoping) that it could make Mr. A immediately available to perform on the contract, consistent with its proposal. See <u>Conley</u>, 142 Fed. Cl. at 183 (explaining that misrepresentation occurred where offeror named former employee as current employee and assumed he would return because of (1) past employment, (2) help drafting initial proposal, and (3) offeror's "discussions" with employee about returning); Patricio Enters. Inc., B-412738, 2016 CPD ¶ 145 (Comp. Gen. May 26, 2016) (finding no reasonable basis to propose individuals as key personnel where offeror had not contacted individuals regarding their availability before submitting proposal); Integration Techs. Grp., Inc., B-291657, 2003 CPD ¶ 55 (Comp. Gen. Feb. 13, 2003) (determining that a proposal representation of a teaming partnership in place was misleading despite "pre-existing relationship" and reasonable expectation that parties could reach agreement after award); ManTech, 94-1 CPD ¶ 326 ("[A]n offeror may not represent the commitment of incumbent employees based only on a hope or belief that the offeror will ultimately be able to make good [on] its representation.").

## 2.   Materiality of Misrepresentations

The agency found that NetCentrics's misrepresentation that it could make Mr. A immediately available to work on the contract consistent with its proposal was a material one.

That conclusion was reasonable, given that the agency clearly relied on that representation when evaluating NetCentrics's proposal.

As noted, the agency assigned NetCentrics a strength for the one-year commitment of its key personnel, including Mr. A. Because NetCentrics did not have reasonable grounds to believe it could make Mr. A immediately available to work on the contract, it also could not reasonably represent that he was committed to stay on as DPM for one year. This misrepresentation was material because the TET characterized the one-year commitment feature of the proposal as providing a "substantial benefit to the Government" in the form of "continuity of capable and knowledgeable contractor Key Personnel." AR Tab 22 at 2892.

Further, NetCentrics also received a strength for the use of incumbent personnel. The agency reasoned, in part, that NetCentrics "and [its] proposed team already operate and are familiar with the requirements described for Service Delivery, and this in turn can allow [NetCentrics] to focus on achieving a more efficient execution of services from the initial transition-in period." Id. at 2889–90. As summarized by the SSA, NetCentrics "received a strength for its Phase-In Plan, which proposes the transition of the same personnel that currently provide services to the JSP." AR Tab 25 at 2972 (emphasis supplied).[7] This feature of its technical approach "reduce[d] the risk of quality of service and staffing, ensure[d] uninterrupted service quality and [would] allow full transfer of services" promptly within the phase-in period. Id. The SSA further observed that "performance risk" was "low" because NetCentrics proposed key personnel "who have agreed to a one-year commitment to provide program stability." Id.

These strengths contributed to NetCentrics's "Outstanding" rating for its technical approach, which in turn became part of the SSA's best value tradeoff analysis. The SSA also observed in connection with the Past Performance factor that NetCentrics had the ability "to quickly ramp-up its performance of IT services and reduce the risk of any lapse in services." Id. at 2975–76.

In sum, Mr. A's current employment and immediate availability were among the bases for NetCentrics's promise of continuity and stability of contract performance. The agency relied on these features of the proposal in its favorable evaluation findings and, ultimately, in the decision to award the contract to NetCentrics. It was reasonable, therefore, for the CO to find that the misrepresentations in the proposal were material.

Finally, NetCentrics contends that the agency could not have relied upon the statement in the final proposal that Mr. A was a current employee because it had notified the WHS contracting office of its intent to replace him on the incumbent contract on November 27, 2018, six days before it submitted its final proposal. Pl.'s MJAR at 10. NetCentrics also observes that

---

[7] NetCentrics implies that this aspect of the best value determination does not rely on Mr. A's availability because of the use of the phrase "same personnel" versus "key personnel." Pl.'s Reply at 17, ECF No. 38. Under the circumstances, this is a distinction without a difference. It is evident that in describing "the same personnel" from the incumbent contract, the SSA could fairly be interpreted to be referring to a group of employees including key personnel—and specifically, Mr. A.

several members of the TET knew that Mr. A was no longer a current employee when it was considering NetCentrics's proposal. Id.

The Court notes that those members of the TET who knew that Mr. A had left NetCentrics were instructed by the CO not to take that knowledge into consideration. But in any event, as the CO's lengthy decision memorandum shows, and as the government acknowledges in its briefs, the agency's disqualification decision was not based on the fact that the proposal did not accurately reflect Mr. A's employment status. Rather, as a result of that misstatement and in response to a bid protest filed by NCI, the agency decided to seek further information to confirm whether—notwithstanding that he was no longer an employee—NetCentrics could still make good on its commitment to make him immediately available to work on the new contract. And for the reasons set forth above, the latter misrepresentation was a material one.

In short, for the reasons set forth above, the CO's finding that NetCentrics's misrepresentations of Mr. A's employment status and availability to perform on the contract were material ones was reasonable. Because the agency provided "a coherent and reasonable explanation of its exercise of discretion" to rescind the award it made to NetCentrics and disqualify it from the competition, NetCentrics's protest must be rejected. See Dell Fed., 906 F.3d at 992.

## CONCLUSION

Based on the foregoing, NetCentrics's motion for judgment on the administrative record (ECF No. 27) is **DENIED**. The government's cross-motion for judgment on the administrative record (ECF No. 35) is **GRANTED**. NetCentrics's motion for preliminary injunction (ECF No. 4) is **DENIED as moot**. The Clerk is directed to enter judgment accordingly. Each side will bear its own costs.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge